## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MICHAEL LUTHER,
*Plaintiff*,

v.                                                No. 3:19-cv-744 (VAB)

THOMAS HUNT, et al.,
*Defendants*.

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Michael Luther ("Plaintiff") initiated this action, while incarcerated at the Brooklyn

Correctional Institution, against Community Release Unit Director Thomas Hunt ("Director

Hunt"), Department of Correction Commissioner Rollin Cook ("Commissioner Cook"), and

Inmate Classification Director David Maiga ("Director Maiga") under 42 U.S.C. § 1983. Civil

Rights Compl., ECF No. 1 (May 16, 2019) ("Compl."). Mr. Luther has since dropped Director

Maiga as a defendant in the case. Mem. in Opp'n to Mot. for Summ. J. at 5, ECF No. 54 (Dec.

29, 2020) ("Pl. Opp'n"). Only Director Hunt and Commissioner Cook (collectively,

"Defendants") remain in the case.

Mr. Luther has alleged that Defendants have an unconstitutional policy or practice of

denying community release to juvenile sex offenders. Compl. ¶¶ 1, 3–4. "Community release"

allegedly refers to a number of programs or facilities designed to assist individuals with

successfully transitioning back into their communities after incarceration. *See* Ex. I to Compl. at

45–47, ECF No. 1 (May 16, 2019).[1] Individuals granted community release are released before

---

[1] Pagination refers to pagination provided by the Court's Electronic Filing System.

the end of their sentence to complete their sentence in the community. *See* Ex. O to Compl. at 60 (May 16, 2019).

Mr. Luther asserted claims on behalf of an alleged class and based on Fourteenth Amendment due process rights, Fourteenth Amendment equal protection rights, the Eighth Amendment right to be free of cruel and unusual punishment, and rights under the United Nations Convention on the Rights of the Child. On January 10, 2020, the Court issued an Initial Review Order that dismissed all of Mr. Luther's claims except for that premised on Fourteenth Amendment equal protection. Initial Review Order and Ruling on Mot. for Emergency Hr'g, ECF No. 9 (Jan. 10, 2020) ("IRO").

Defendants have moved for summary judgment on Mr. Luther's remaining claim. Defs.' Mot. for Summ. J., ECF No. 43 (Oct. 2, 2020) ("Defs.' Mot."); Mem. of Law in Supp. of Mot. for Summ. J., ECF No. 43-1 (Oct. 2, 2020) ("Defs.' Mem.").

For the reasons explained below the Court **GRANTS** Defendants' motion for summary judgment.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[2]

The Department of Corrections' ("DOC") Community Release Unit reviews prisoners' eligibility for the community release programs. Defs.' Local R. 56(a)(1) Statement ¶¶ 1–3, ECF No. 43-2 (Oct. 2, 2020) ("Defs.' 56(a)(1) Statement"). When conducting a review for eligibility,

---

[2] The facts are taken from Mr. Luther's Complaint, Defendants' Local Rule 56(a) Statement, Mr. Luther's Local Rule 56(a) Statement, and supporting exhibits filed by all parties. *See* D. Conn. L. Civ. R. 56(a)(1) ("Each material fact set forth in the Local Rule 56(a)(1) Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact."). Local Rule 56(a)(2) requires the party opposing summary judgment to submit a Local Rule 56(a)(2) Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)(1) Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)(2),56(a)(3).

the Community Release Unit "looks at all the information available to them through DOC, including information pertaining to the inmate's criminal offenses, his conduct within DOC, DOC classification information, information from law enforcement and the courts, etc." Defs.' 56(a)(1) Statement ¶ 6. Defendants claim that "[e]ach review is conducted on an individual basis and . . . approvals or denials are done on a case-by-case basis." *Id.* ¶ 7. Moreover, according to Defendants, "[n]o inmate that is eligible for a program is automatically denied based upon the crime(s) he committed." *Id.* ¶ 7. Mr. Luther denies this final point, alleging that "[i]nmates serving a sentence for a sex offense or having a Sexual Treatment Needs Score ("STNS") of two or greater (STNS>2) are routinely served cursory denials for 'nature of offense' and 'impact to victim,' as Mr. Luther was[.]" Pl.'s Local R. 56(a)(2) Statement in Opp'n to Defs.' Mot. for Summ. J. ¶ 7, ECF No. 54-1 (Dec. 29, 2020) ("Pl.'s 56(a)(2) Statement").

Director Hunt served as Director of DOC's Community Release Unit during the relevant period. Defs.' 56(a)(1) Statement ¶ 1. He "recalls conducting his review on May 10, 2019" of Mr. Luther's application for early release to a residential placement program. *Id.* ¶ 8. In conducting this review, Director Hunt allegedly looked at

> the information that DOC made available, including his Presentence Investigation Report, his parole application/information, his criminal history, information from law enforcement and the courts, information pertaining to his conduct in DOC, *etc*. They also reviewed information regarding the plaintiff's programming and accomplishments during his incarceration.

*Id.* ¶ 9.

Director Hunt "decided to deny [Mr. Luther] for early release," a decision that "was primarily based upon the information in [Mr. Luther's] Presentence Investigation Report." *Id.* ¶¶ 10, 11. According to Director Hunt, he "was concerned with the number of crimes the [P]laintiff committed, the nature of the crimes, the number of people he victimized, and the impact his

crimes had on those victims." *Id.* ¶ 11. Specifically, Defendants note that Mr. Luther "pled guilty to numerous sexual acts preying on minors over the course of several years," "pled guilty to numerous charges including risk of injury and sexual assault," and "continued his sexual misconduct during his incarceration by sexually assaulting another inmate." *Id.* ¶¶ 13, 14. Defendants note that the Presentence Investigation Report "also states that [Mr. Luther] had been referred . . . for . . . Treatment of Problem Sexual Behaviors . . . [,] that he was deemed a 'Moderate High Risk for recidivism,'" *Id.* ¶ 15, and that the report "goes into extensive detail about the long-term and traumatizing psychological impact on the [P]laintiff's victims and their families." *Id.* ¶ 16.

Director Hunt "believed that releasing the [P]laintiff early from his sentence would cause an unnecessary risk to public safety and potentially his victims," and therefore denied release. *Id.* ¶ 17. The form on which Director Hunt issued his denial "indicated that the reasons [for the denial] were the 'Nature and/or Circumstances of the Current Offense' and 'Injury and/or Impact to the Victim(s) or the Victim's Family.'" *Id.* ¶ 18 (citing Attach. 2 to Defs.' Mot. for Summ. J., ECF No. 43-3 (Sept. 4, 2020)). According to Director Hunt, he "did not detail the specifics [on the form] because the inmate receives a copy of this form to keep in his cell, and [Director Hunt] does not want other inmates to learn any sensitive information that could jeopardize the inmate's safety[.]" *Id.* ¶ 19.

Defendants contest the involvement of Commissioner Cook, who served as the Commissioner of the Connecticut Department of Correction from January 9, 2019 to June 30, 2020. *Id.* ¶ 20. According to Defendants, Commissioner Cook "was not personally involved in any of the [Community Release Unit's] reviews or decisions with regards to inmate applications for early release." *Id.* ¶ 22. Commissioner Cook also says he has "no recollection of [Mr. Luther]

4

bringing any of his issues or concerns to [Commissioner Cook's] attention during his time as Commissioner." *Id.* ¶ 23.

Defendants finally allege that Plaintiff "seeks to change an alleged discriminatory practice," and therefore "was required to follow the grievance process outlined in AD 9.6, Section 6 in order to exhaust administrative remedies." *Id.* ¶ 35. The grievance procedure, according to Defendants, "is the proper administrative remedy for 'any issue relating to policy and procedure, and compliance with established provisions.'" *Id.* ¶ 27. Defendants indicate that Mr. Luther, during his time at the Brooklyn Correctional Institution, filed numerous administrative remedies and appeals, but none "pertaining to an allegedly discriminatory practice of denying community release halfway house placement to inmates convicted of sexual offenses." *Id.* ¶¶ 38, 39.

Mr. Luther contests the claim that Director Hunt reviewed all of the information that DOC made available. He alleges that Director Hunt "either ignored or failed to give any weight to important evidence about the [P]laintiff's current situation, his record and reformation since April 2004." Pl.'s 56(a)(2) Statement ¶ 9. He specifically draws attention to a June 6, 2016 evaluation—created by the same company that prepared the evaluation included in the Presentence Investigation Report—which "reduced the [P]laintiff's risk classification to moderate and noted many positive factors in his case." *Id.* ¶¶ 9, 15. Plaintiff also draws the Court's attention to a 2017 evaluation by Fabian M. Saleh, M.D., D.F.A.P.A. Assistant Clinical Professor of Psychiatry, Harvard Medical School which,

> stat[es] that the Connection evaluation's reliance on STATIC-99 and SOPTIPS is "inconsistent with the standard of forensic practice," . . . and potentially misleading as they have not been validated for child offenders, and that Mr. Luther "does not present an imminent risk to the community."

*Id.* ¶ 9 (quoting Ex. A to Opp'n to Defs.' Mot. for Summ. J. at 4, ECF No. 54-2 (July 21, 2017).

Mr. Luther notes that though Director Hunt claims he denied release because of concerns regarding the number of crimes, the nature of the crimes, the number of people he victimized, and the impact his crimes had on those victims, Director Hunt did not provide these reasons at the time that he denied release. *Id.* ¶¶ 7, 11, 19.

Mr. Luther also contests the argument that Commissioner Cook was not involved in the Community Release Unit's reviews or decisions regarding inmate applications for early release. He notes that "DOC's Agreement for Community Release . . . states that transfer to Community Release programs is based on the conclusion of the 'Commissioner of Correction that there is a reasonable probability' that the inmate will successfully participate in the program." *Id.* ¶ 22. Mr. Luther claims that he "wrote the Commissioner a three-page letter on February 4, 2019 which expressed concerns that he would 'be denied any opportunity to go to a halfway house due to the nature of [his] offense.'" *Id.* ¶ 23. Plaintiff and Commissioner Cook also allegedly "spoke for about fifteen minutes on May 28, 2019" during which "Commissioner Cook rebuffed the efforts of Karen Martucci, DOC Director of External Affairs to 'take over' the conversation." *Id.* ¶ 23.

### B.  Procedural History

On May 16, 2019, Mr. Luther filed his Complaint against Defendants in this Court. Compl.

On July 15, 2019, Mr. Luther filed a motion for an emergency hearing requesting injunctive relief. Mot. for Emergency Hr'g, ECF No. 8 (July 15, 2019).

On January 10, 2020, the Court issued an Order denying the motion for hearing and dismissing Mr. Luther's claims under the Due Process Clause of the Fourteenth Amendment, the Eight Amendment, and the United Nations Convention on the Rights of the Child, as well as all

of his claims on behalf of an alleged class. Order Den. Mot. for Hr'g, ECF No. 10 (Jan. 10, 2020).

On March 23, 2020, Mr. Luther filed a motion for default entry as to the Defendants. Mot. for Default: Failure to Plead or Otherwise Defend, ECF No. 19 (Mar. 23, 2020).

On March 25, 2020, the Court issued an Order granting the motion for default entry. Order Granting Mot. for Default Entry, ECF No. 20 (Mar. 25, 2020).

On April 9, 2020, Defendants filed a motion to dismiss the allegations against Director Maiga. Defs.' Mot. to Dismiss, ECF No. 22 (Apr. 9, 2020); Defs.' Mem. of Law in Supp. of Mot. to Dismiss, ECF No. 22-1 (Apr. 9, 2020).

On the same day, Defendants filed a motion to set aside the default entry. Defs.' Mot. to Set Aside Default, ECF No. 23 (Apr. 9, 2020).

On April 10, 2020, the Court issued an Order granting the motion to set aside the default entry. Order Granting Mot. to Set Aside Default, ECF No. 24 (Apr. 10, 2020).

On April 27, 2020, Mr. Luther filed an objection to Defendants' motion to dismiss. Pl.'s Mot. in Opp'n to Def. Maiga's Mot. to Dismiss, ECF No. 27 (Apr. 27, 2020).

On May 7, 2020, Defendants filed a motion to stay the proceedings until July 1, 2020. Defs.' Mot. to Stay Proceedings, ECF No. 29 (May 7, 2020).

On May 8, 2020, the Court granted Defendants' motion to stay the proceedings. Order, ECF No. 30 (May 8, 2020).

On May 22, 2020, Mr. Luther filed a motion to reconsider and resubmit his objection to stay proceedings. Pl.'s Mot. to Resubmit Obj. to Defs.' Mot. to Stay Proceedings as 'Mot. to Reconsider,' ECF No. 34 (May 22, 2020).

On June 8, 2020, Mr. Luther filed a motion to amend the Complaint. Pl.'s Mot. to Amend Compl., ECF No. 35 (June 8, 2020).

On July 1, 2020, Mr. Luther filed a motion to compel. Pl.'s Mot. to Compel Defs., ECF No. 37 (July 1, 2020).

On July 10, 2020, Mr. Luther filed a motion for articulation. Pl.'s Mot. Requesting Articulation From the Court, ECF No. 36 (July 10, 2020).

On July 22, 2020, Defendants filed an objection to Mr. Luther's motion to compel. Defs.' Obj. to Pl.'s Mot. to Compel, ECF No. 38 (July 22, 2020).

On October 2, 2020, Defendants filed a motion for summary judgement. Defs.' Mot.; Defs.' Mem.

On December 29, 2020, Mr. Luther filed a memorandum in opposition to Defendants' motion for summary judgment. Pl. Opp'n.

On January 29, 2021, the Court issued an Order denying Mr. Luther's motion for reconsideration, Defendants' motion to dismiss, and Mr. Luther's motion to compel. In the same order, the Court granted Mr. Luther's motion to amend his complaint and his motion for articulation. Order, ECF No. 55 (Jan. 29, 2021).

## II.   STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law.") (citing *Anderson*, 477 U.S. at 248).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III.   DISCUSSION

Mr. Luther's remaining claim against Defendants alleges that DOC's indifference in the treatment of juvenile sex offenders like himself—routinely denying community release to community release applicants who are assigned a Classification Sex Treatment Needs Score of 2 or greater—violates the Equal Protection Clause of the Fourteenth Amendment. Compl. ¶¶ 15, 20, 41(a)–(b).

The Equal Protection Clause protects individuals from invidious discrimination. It does not mandate identical treatment for each individual or group of individuals. Instead, it requires that similarly situated persons be treated the same. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of

the laws,' which is essentially a direction that all persons similarly situated should be treated alike." (citation omitted)).

Where a classification is based on the nature of a criminal offense, including a sex offense, courts apply rational basis scrutiny. *Roe v. Marcotte*, 193 F.3d 72, 82 (2d Cir. 1999) ("Because [plaintiff] alleges a classification based on the nature of his offense, his challenge . . . is entitled to only 'rational basis' and not 'strict scrutiny' review." (citing *Chapman v. United States*, 500 U.S. 453, 465 (1991) (applying rational basis test to a classification based on nature of offense))); *see also Duemmel v. Fischer*, 368 F. App'x 180, 182 (2d Cir. 2010) (stating, in a case brought by an incarcerated sex offender, "[w]e have previously held that 'prisoners either in the aggregate or specified by offense are not a suspect class'" (quoting *Lee v. Governor of New York*, 87 F.3d 55, 60 (2d Cir. 1996)); *Petitpas v. Martin*, No. 3:17-cv-1912 (JAM), 2018 WL 5016997, at *5 (D. Conn. Oct. 15, 2018) ("Neither prisoners in general nor sex offenders in particular are a suspect class." (citing *Graziano v. Pataki*, 689 F.3d 110, 117 (2d Cir. 2012)).

Thus, the Court must find the alleged classification here constitutional so long as "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 136–38 (2d Cir. 2013) (quoting *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 219 (2d Cir. 2012) (citing *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313 (1993))) (holding that "a reasonable public official in the position of [Commissioner of the Department of Corrections or Director of Temporary Release Programs] could reasonably have believed there was a rational basis for distinguishing between leaves of absence for the treatment of mental illness as opposed to other sorts of illness").

Mr. Luther makes several arguments in support of his Equal Protection claim. First, he alleges that DOC's heavy reliance on STATIC-99R, a risk evaluation instrument, places individuals who were convicted of sex offenses in their youth, like Mr. Luther, at an "extreme disadvantage" when compared to sex offenders convicted as adults. Pl. Opp'n at 5–6. Mr. Luther highlights that STATIC-99R, developed in 2000, "while . . . validated in a number of studies, including two large ones in California, for use with adult males who have committed contact offenses, [ ] has not been validated for male juveniles[.]" *Id.* at 6. The added alleged failure of DOC to use evaluations available in Mr. Luther's parole file that "at least attempted to grapple with shortcomings of STATIC-99 as applied to inmates who committed sex offenses as adolescents" is noted in further support of unequal treatment of juvenile offenders, who Mr. Luther argues are "similarly situated" to those who offended as adults. *Id.* at 7.

Mr. Luther argues that "while the reviews [of both types of sex offenders] are facially similar, the critical factors of dangerousness and risk of recidivism depend on evaluations which are invalid for the youthful offenders." *Id.* at 8. Mr. Luther cites to *Murphy v. Raoul*, 380 F. Supp. 3d 731 (N.D. Ill. 2019) as an example of a case where a federal court found a violation of equal protection even though "rules were even on their face," but led to different outcomes for sex offenders who, because they were indigent and homeless, could not comply with the requirements needed for the mandatory supervised release program. According to Mr. Luther,

> [j]ust as indigent Illinois sex offenders cannot control their poverty, Mr. Luther cannot control DOC's use of an invalid evaluation instrument to evaluate his dangerousness and risk of recidivism or Defendant Hunt's failure to evaluate more recent, better quality evaluations contained in his file.

Pl. Opp'n at 8. Mr. Luther further highlights that "[t]he importance of DOC not discriminating against inmates who offended as juveniles is underscored by [the] Supreme Court's decisions

that fundamentally altered the severity of punishments that could be imposed on juvenile offenders." *Id.* at 9 (citing *Graham v. Florida*, 560 U.S. 48 (2010); *Miller v. Alabama*, 567 U.S. 460 (2012); *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016)).

Mr. Luther also argues that DOC's "arbitrary, disparate treatment of [him] supports a class-of-one equal protection claim." *Id.* at 12. According to Mr. Luther, class-of-one claims require that a plaintiff "show using data for reasonably comparable individuals that he was 'singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose . . . is all but certain." *Id.* (citing *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005)). To support a finding of improper purpose, Mr. Luther again notes that Director Hunt "relied on an evaluation from an unvalidated instrument reported in brief summary fashion in the fifteen-plus year[-]old PSI rather than on two recent, detailed evaluations" that attempted to "address the invalidity" of the older instruments with regard to "inmates who committed sex offenses as minors." *Id.*

To further bolster his argument, Mr. Luther notes that from March 2015 to October 2019 "seven inmates with a [Sexual Treatment Needs Score] of two or greater serving a sentence for a sex offence were approved for community release out of 2,287 who applied for review," while "ninety-three inmates serving a sentence for murder, one-hundred forty-two serving a sentence for kidnapping, and 285 inmates with a history of violence score above two were approved for community release." *Id.* at 13.

Finally, Mr. Luther makes a tangential argument concerning the exercise of discretion. Mr. Luther says that "a failure to exercise discretion is an abuse of discretion." *Id.* at 11. According to him, "[i]gnoring critical, relevant parts of the record, issuing a cursory, rote denial with essentially no record of the basis of the decision, then scrambling to come up with a

justification after the fact during litigation is not a fair review." *Id*. In support, Mr Luther cites to

*United States v. Copeland*, 376 F.3d 61, 72 (2d Cir. 2004), which analogizes due process rights

in Section 1983 cases to rights to hearings in the immigration context.

Defendants argue that summary judgment should be granted because Mr. Luther has not

met his burden of "produc[ing] evidence to 'discredit any conceivable basis which could be

advanced to support the challenged provision'" Defs.' Mem. at 8 (citing *Petitpas*, 2020 WL

5501394, at *7). Meanwhile, Defendants have "provided an overwhelming amount of evidence

to support denying the plaintiff's application for early release," despite only needing to provide

"'any reasonably conceivable state of facts that could provide a rational basis for the

classification.'" *Id*. at 9 (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). Defendants

specifically point to Director Hunt's declaration, which outlines his reasons for denying early

release to Mr. Luther. *Id.* at 8–9; Defs.' 56(a)(1) Statement ¶¶ 8–18. They emphasize that

Director Hunt reviewed the "Presentence Investigation Report, [Mr. Luther's] parole

application/information, his criminal history, information from law enforcement and the courts,

information pertaining to his conduct in DOC," and "information regarding [Mr. Luther's]

programming and accomplishments during his incarceration." Defs.' Mem. at 8; Defs.' 56(a)(1)

Statement ¶ 9. These facts, Defendants argue, entitle them to judgment in their favor. Defs.'

Mem. at 9.

The Court agrees.

At the summary judgment stage, Mr. Luther carries the burden of producing evidence to

"discredit any conceivable basis which could be advanced to support the challenged provision,

regardless of whether that basis has a foundation in the record or actually motivated the

[decisionmaker]." *Beatie v. City of New York*, 123 F.3d 707, 713 (2d Cir. 1997) (internal

quotations and citations omitted). "Even just '*some* evidence' to support a rational basis for a classification will be sufficient to uphold the classification at summary judgment." *Petitpas*, 2020 WL 5501394, at *7 (emphasis in original) (quoting *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 285 (2d Cir. 2015)). The Court must find the alleged classification here constitutional so long as "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Spavone*, 719 F.3d at 136–38 (quoting *Bryant*, 692 F.3d at 219)).

Mr. Luther has not provided evidence to support his claim that he, or other juvenile sex offenders like him, were denied early release because of a faulty evaluation system, whereas similarly situated adult sex offenders who were not affected by that evaluation system were granted release. Indeed, the twenty-one-page Presentence Investigation Report that Director Hunt relied on in deciding whether to grant Mr. Luther early release, Sealed Attach. 1. to Ex. 1, ECF No. 45 (Oct. 2, 2020), contains only one paragraph concerning the evaluation that, according to Mr. Luther, leads to disparate results between juvenile and adult sex offenders. As Defendants indicate in their motion for summary judgment, they have provided ample evidence to support denying Mr. Luther's application for early release. Director Hunt has attested that he considered a host of information, which went beyond the challenged STATIC-99 and SOPTIPS evaluations. Defs.' 56(a)(1) Statement ¶ 9. In fact, the form on which Director Hunt issued his denial "indicated that the reasons [for the denial] were the 'Nature and/or Circumstances of the Current Offense' and 'Injury and/or Impact to the Victim(s) or the Victim's Family.'" *Id.* ¶ 18; Attach. 2 to Ex. 1, ECF No. 43-3 (Oct. 2, 2020). Neither of these statements appear to refer to the conclusions drawn from the STATIC-99 or SOPTIPS evaluations.

Mr. Luther also draws the Court's attention to statistics showing that, over a period of about four and a half years, significantly fewer sex offenders were approved for community

release than were prisoners serving sentences for murder, kidnapping, and other violent crimes. These numbers, however, fail to show the more helpful comparison: proportions of prisoners from each category. More importantly, these statistics do not help shed light on the comparison that Mr. Luther wishes to emphasize: the success rates of juvenile and adult sex offenders in obtaining community release. To the extent that Mr. Luther is attempting to challenge the application of the classification and evaluation of all sex offenders compared to that applied to all other prisoners, there is no potential Equal Protection violation. *See Green v. Armstrong*, 189 F.3d 460, at *2 (2d Cir. 1999) (summary order) ("Prisoners who have committed sex offenses can rationally be deemed more dangerous to society . . . ."); *Roe v. Marcotte*, 193 F.3d 72, 82 (2d Cir. 1999) (finding that a statute requiring sex offenders but not other violent felons to submit blood samples did not violate the Equal Protection Clause).

Finally, Mr. Luther's argument regarding the use of discretion is not relevant to his equal protection claim. The Second Circuit does not assess the execution of discretion as part of the equal protection analysis. This argument has no bearing on the question of summary judgment. Thus, Mr. Luther has no viable equal protection claim.

In any event, qualified immunity would attach and dismiss any claim seeking monetary relief. Defendants argue that the Court also could enter judgment in their favor "because they are entitled to qualified immunity." Defs.' Mem. at 10.

The Court agrees.

"Qualified immunity protects federal and state officials from money damages and 'unnecessary and burdensome discovery or trial proceedings.'" *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998); *see also Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) ("Qualified immunity shields police

officers acting in their official capacity from suits for damages unless their actions violate clearly-established rights of which an objectively reasonable official would have known." (internal alterations, quotation marks, and citation omitted)). It "is an affirmative defense that the defendants have the burden of raising in their answer and establishing at trial or on a motion for summary judgment." *Coollick*, 699 F.3d at 219.

When a court analyzes the question of whether public officials are entitled to qualified immunity, there are two issues that guide the inquiry. *See Zalaski v. City of Hartford*, 723 F.3d 382, 388–89 (2d Cir. 2013). First, the court considers whether "the facts show that the officer's conduct violated plaintiff's constitutional rights." *Id.* at 388. Second, if the answer is no, "further inquiry is unnecessary because . . . there is no viable constitutional claim," but if the answer is yes, "or at least not definitively no," the court may move on to the second question "was the right clearly established at the time of defendant's actions?" *Id*. The Second Circuit has clarified that "[s]o long as a defendant has an objectively reasonable belief that his actions are lawful, he is entitled to qualified immunity." *Spavone*, 719 F.3d at 135 (internal quotation marks and citation ommited).

Courts need not consider these two questions in order, and may consider the latter question first, which may be "particularly appropriate where the former turns on difficult or novel questions of constitutional or statutory interpretation, but it is nevertheless clear that the challenged conduct was not objectively unreasonable in light of existing law." *Zalaski*, 723 F.3d at 389 (internal quotation marks omitted) (citing *Coollick*, 699 F.3d at 219–20).

Based on the facts presented, the Court concludes that no reasonable jury could make the necessary factual finding that it would have been objectively unreasonable for someone in the Defendants' position to believe that they were "acting in a manner consistent with [Mr. Luther's]

right to equal protection." *Spavone*, 719 F.3d at 135, 137–38 (concluding that Department of Correctional Services officials were entitled to qualified immunity where a jury could not conclude that it was unreasonable for them to believe that a distinction between medical leave for physical ailments and mental illness could pass constitutional muster). As discussed above, Director Hunt explained that he applied the typical process for assessing early release eligibility to Mr. Luther's case. The record reveals that Mr. Luther's early release application was handled in the same manner as those of other sex offenders who were convicted as adults. Defendants had no apparent reason to believe that Mr. Luther, or other sex offenders convicted as juveniles, had their constitutional rights violated when the Community Release Unit applied the same review process to both categories of inmates. *See id.* at 138 ("Simply put, the record reveals no basis on which to conclude that [defendants] could not reasonably have believed . . . that the mental health needs of DOCS inmates were being met[.]")

Accordingly, Defendants' motion for summary judgment will be granted.[3]

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED.**

The Clerk of Court is respectfully directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of September, 2021.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[3] The Court further notes that, based on this record—and as a matter of law—Commissioner Cook lacks sufficient personal involvement in Mr. Luther's case and would have to be dismissed from this case, even if Mr. Luther had a viable claim. *See Iqbal*, 556 U.S. at 676 ("[R]espondent correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.").